## Pennington et al. v. Napier et al.

February 21, 1947.

Rehearing denied May 23, 1947.

Robert R. Friend, Special Judge.

S. M. Ward and J. B. Eversole for appellants.

C. A. Noble and D. G. Boleyn for appellees.

OPINION OF THE COURT BY JUDGE SIMS—Affirming.

From a judgment holding a deed executed by Floyd Napier and wife to H. E. Pennington and wife to be a mortgage, the Penningtons and other interested persons who were parties to this litigation have appealed.

On Nov. 28, 1940, appellees, Floyd Napier and wife, conveyed to appellants, H. E. Pennington and wife, their farm located in Perry County for the recited consideration of $238 cash. The deed described the land by metes and bounds but did not give the number of acres, however the petition recites it contained 160 acres. On the same day the deed was executed Napier and Pennington entered into this agreement:

"This agreement made and entered into by H. E. Pennington, party of the first part, & Floyd Napier, party of the second part.

"Witnesseth: That the party of the first part agrees to sell back to Floyd Napier a certain tract or parcel of land deeded to the first party, deed bearing date of November 28, 1940, provided said Floyd Napier pays to the first party $238.00 within 90 days from this date. If not the deed is in full force and effect.

"This Nov. 28th, 1940. Witnesseth our signatures this the date above. (Signed) Floyd Napier, H. E. Pennington."

Pennington and wife on Dec. 11, 1941, conveyed this farm to Rex Napier, a son of Floyd, for the recited con-

sideration of ''one dollar and other good and valuable consideration.'' The true consideration for this deed was the conveyance of a farm worth $400 to the Penningtons by Drew Combs, the father-in-law of Rex. In addition thereto Pennington received 25 bushels of corn and the deed to a right of way. It was testified by Drew and Rex that before they bought this land from Pennington that Floyd entered into this contract with Rex:

''This writing is to certify that I Floyd Napier, and Wife, did on November 28, 1940 execute a deed of conveyance to H. E. Pennington and wife for my home farm at napfor Ky. on Napiers Brench I Floyd Napier resured the rite to buy said farm back within 90 days from date of deed on my failure to buy said land back I floyd Napier now persume that said H. E. Pennington now holds a clear title. to said land I Floyd Napier now insist that my son Rex Napier buy said land off H. E. Pennington and moves my children back home and continues to care for them as he has every since my former wifes death who deceased about 5 years ago said Rex Napier agrees to furnish his father said Floyd Napier a home as said farm as long as said Floyd Napier and wife don't give any trouble in any way are manner, it now agreed and the part of said Floyd Napier that he will not interfere in any way or manner with the execution of said agreement or its performances and will not attempt to hinder by suit in court or otherwise with said Rex Napier. cutting remaining and selling all of the timber from said land.

''Witness the hands of the parties this the Nov. 5, 1941. (Signed) Floyd Napier, Drew Combs, Rex Napier.'' Drew signed this paper as a witness to Floyd's signature.

On Feb. 17, 1941, Rex and wife in consideration of $1 and other good and valuable considerations conveyed to Drew a one-half interest in all the timber on the part of this land known as ''Lot No. 2'' and, as we construe the deed, a one-half interest in the balance of the land which is described as ''All of land lying on East side of Henson Ford.'' The real consideration for this deed was to reimburse Drew for what he was out in securing the deed from the Penningtons. By an undated deed acknowledged on Feb. 13, 1943, Drew transferred to his

brother, Girdley Combs, for the recited consideration of $700 the identical interest in the timber and in the land which was conveyed to Drew by Rex. This deed from Drew to Girdley contained a provision that Drew would pay Girdley $5 per 1000 feet for all maple, poplar and oak and $2.50 per 1000 feet for all beech Drew might cut from the land. It is worthy of note that Girdley made this purchase without even taking a look at what he was buying.

Without analysing the evidence in detail it will suffice to say that it amply supported the chancellor's finding that the deed executed by Floyd and wife to the Penningtons was intended to be a mortgage by the parties to that transaction. There is no contrariety in the proof as to Floyd remaining in possession of the farm and that he received but $200 from Pennington upon the execution of the deed. The $38 he was to pay Pennington (in addition to the $200 received from him) upon the reconveyance of the property, represented interest on the loan. Furthermore, Pennington admits that after the 90 days expired Floyd accompanied by his wife and Bill Johnson came to Pennington to pay the $238 and redeem his farm. Pennington then told Floyd, ''If you can get this money to pay me back for this place without having to give up the land to some other party that will be all right, but if you have to do that, you had just as well let me keep it as to give it to the other party.''

In determining whether an instrument is a deed or a mortgage the rule is that the nature of the writing should be determined from the intention of the parties as ascertained from the facts and circumstances surrounding the transaction. If there is any doubt as to whether the transaction is a mortgage or a conditional sale, it will be held to be a mortgage, and whatever the instrument was in the beginning it remained that, as is illustrated by the maxim, ''Once a mortgage always a mortgage.'' Talley v. Eastland, 259 Ky. 241, 82 S. W. 2d 368, 373. The Talley opinion is not only full but it exhausts the subject, and we see no necessity of referring to other authorities. The author of that opinion wrote: ''In the preparation of this opinion we have examined scores of cases, foreign and domestic, and have not found one wherein a man had executed a paper like this one,

had been allowed to continue in possession without a lease and without rent, wherein the paper was held not to be a mortgage.''

Appellants put great reliance in Charles v. Thacker, 167 Ky. 835, 181 S. W. 611. The facts in that case clearly distinguish it from the instant one. There, an old debt was extinguished by the deed and the grantors were left to pay or not as they chose. More than that, the grantors surrendered possession of the farm and the grantee and his heirs remained in the undisputed possession of it for seven years before the action was brought; also, there was no great disproportion between the value of the property and the amount of the debt. In the case before us there was no old debt extinguished by the deed. The grantors remained in possession and a farm of 160 acres in which Drew conveyed a one-half interest to his brother Girdley for $700, and a farm which Bill Johnson testified was worth $3,000, went to the Penningtons for the pitiful sum of $200 cash.

In their answers appellants pleaded an estoppel against Floyd by reason of the agreement he executed to Rex on Nov. 5, 1941. Floyd denied signing that paper, but from a comparison of the signature thereon with his other signatures, admitted to be genuine, we are of the opinion that he did sign it. However, this record convinces us that Floyd did not know, or at least did not understand, what he was signing when he put his signature to that paper. Drew prepared it and he appears to be as smart and cunning as Floyd is dull and naive. In obtaining the signature of the dull witted Floyd to this contract Drew and Rex hoped, with the aid of Pennington, they would tie Floyd's hands and thereby be able to take his farm for a fraction of its real value. Rex never performed the obligations this contract imposed upon him. It would appear that Drew was shrewd enough to try and bring in an innocent purchaser in the form of his brother Girdley. There was provision in the deed which Drew executed to Girdley allowing Drew to cut timber from the land by paying Girdley a modest price therefor, which was to apply as a credit on what Girdley owed Drew for the land. It is patent that Drew's idea in conveying his interest in the timber and land to his brother was merely to put

the legal title in Girdley while Drew continued to cut the valuable timber.

We are no more impressed with appellants' plea of estoppel than was the chancellor. One may not go out and deliberately build up an estoppel against his duller brother, or trick him into a position where he will be estopped. The doctrine of estoppel is founded on good morals and is applied to prevent fraud and should not be permitted to defeat justice, as was attempted by appellants here, and thereby make itself obnoxious. 19 Am. Jur. sec. 4, p. 602. It is elementary in the law of estoppel that before one may be estopped the other party must have been innocent of the true situation and must have been misled to his prejudice. Fordson Coal Co. v. Garrard, 277 Ky. 218, 125 S. W. 2d 977, 121 A. L. R. 841. The fact that Rex is the son of Floyd and the son-in-law of Drew must not be overlooked. Rex and Drew were thoroughly conversant with Floyd's situation as well as his guilelessness. They were neither innocent of the true situation nor were they misled to their prejudice by Floyd signing the contract with Rex. It appears to us that Drew and Rex sought to perpetrate a fraud on Floyd and as a part of their scheme they induced him to sign the agreement that he would give them no trouble when they obtained a deed from Pennington to his land. The evident purpose in obtaining his signature to the agreement was that they could use it as an estoppel against Floyd. Such conduct will not be tolerated by a court of equity, and certainly it will not put into the hands of these wrongdoers one of its chief weapons against the perpetration of an injustice— estoppel.

The chancellor correctly adjudged the instrument Floyd executed to Pennington was a mortgage and not a deed and that the subsequent conveyances operated merely as a transfer of the equitable lien created by that instrument. And he correctly adjudged a lien on Floyd's land in favor of Girdley Combs in the sum of $200 with interest from Nov. 28, 1940, subject to a credit of $70 as of Feb. 1, 1943, for timber cut.

In the preparation of this record the circuit court clerk has paid but little attention to our rules. Section 1.100 requires that the clerk use opaque paper and a

typewriter with a ribbon which is not worn so as not to blur the letters. The record before us is so dim as to be trying on the eyes when read. Nor did the clerk furnish a complete index showing the name of each witness and the page on which his testimony began as is required by sec. 1.180. His index as to witnesses merely recites ''Depositions for Plaintiffs, page 55-95;'' ''Depositions for Defendants, page 103-177.'' And his index of the exhibits is in this same general form, which fails to comply with sec. 1.180. Also, the clerk failed to incorporate in the first volume an index of the entire record as required by sec. 1.180. Section 1.260 imposes the duty on attorneys to see that our rules are complied with in making up records.

This character of record has been many times criticised and the clerk penalized therefor. McNabb v. South Eastern Gas Co. of West Virginia, 268 Ky. 532, 105 S. W. 2d 622; Crider v. Kentenia-Catron Corporation, 214 Ky. 353, 283 S. W. 117. In the instant case the clerk's fee is taxed as $87, and we now direct the Judge of the Perry Circuit Court to enter the proper order upon the filing of the mandate causing $15 to be deducted from the fee of the circuit clerk and refunded to appellants.

The judgment is affirmed.